Nathan H. FRIEDMAN, M.D., Plaintiff,

v.

John A. MANFUSO, Jr., Defendant.

and

ALCON LABORATORIES, INC., Defendant and Third-Party Plaintiff,

v.

John A. MANFUSO, et al., Third-Party Defendants.

Civ. A. No. 83–2741.

United States District Court, District of Columbia.

Feb. 25, 1985.

Michael S. Horwatt and Thomas J. Shaughnessy, Odin, Feldman & Pittleman, Fairfax, Va., for plaintiff.

Jeffrey S. Davidson and David K. Perdue, Kirland & Ellis, Washington, D.C., for defendant and third-party plaintiff.

James Robertson and Joseph K. Brenner, Washington, D.C., for third-party defendants.

## MEMORANDUM OPINION

JUNE L. GREEN, Senior District Judge.

This matter is before the Court on cross-motions for partial summary judgment by plaintiff and defendant Alcon Laboratories, Inc. ("Alcon"), their respective oppositions thereto, the parties' replies, and the entire record herein. For the reasons stated below, the Court grants defendant Alcon's motion for partial summary judgment and denies plaintiff's cross-motion.

On September 16, 1983, plaintiff Friedman brought this action for compensatory and punitive damages against defendant Alcon. Plaintiff thereafter amended the complaint to add defendant John A. Manfuso, Jr. ("Manfuso").[1] In his amended complaint, plaintiff alleged that he was not "fully and fairly" paid the royalties and other compensation due to him under a license agreement involving his invention of an electrode cream. Amended Complaint ¶¶ 19–21.

Defendant Alcon filed a motion for partial summary judgment, contending that plaintiff could not recover on the majority of his claims because of either the applicable statute of limitations or the unconditional assignment of the patent and trademark rights. Plaintiff cross-filed for partial summary judgment, claiming that defendants fraudulently concealed their breach of the license agreement and thereby deprived plaintiff of the true value of his invention and the related patent and trademark rights.

---

1. The parties stipulated that the Amended Complaint would not be served on defendant Manfuso until after the Court's decision on the cross-motions for partial summary judgment. Stipulation (filed Jan. 2, 1985).

*Statement of Facts*

In February 1958, plaintiff Friedman entered into a license agreement with Burton Parsons Chemicals, Inc. ("Burton Parsons"), the predecessor in interest of defendant Alcon.[2] Under the agreement, Burton Parsons received exclusive rights to "manufacture, promote, sell and distribute" EKG Sol, an electrode cream invented by plaintiff, in exchange for the payment of royalties. Exhibit A ¶¶ 2, 3 to Amended Complaint. The exclusive rights of Burton Parsons were to continue until the end of the patent term. In addition, the company received the right "to utilize and exploit Inventor's trade-marks ... and to utilize Inventor's secret processes, information and know-how concerning the manufacture of [the invention]." *Id.* ¶ 2.

In exchange, plaintiff received $2,500, plus seven percent of the first $20,000 of the company's annual "net sales" and five percent of the "net sales" above $20,000. The payments were to be made quarterly and to include a statement of the "net sales" and "any other particulars necessary or material." The agreement defined "net sales" as the gross selling price less customer discounts, returns, taxes, and freight. *Id.* ¶ 3.

The agreement permitted Burton Parsons to use affiliated corporations to sell and distribute EKG Sol. In that case, however, "net sales" was defined as sales "to the wholesale and retail drug market and shall not mean the sale of The Compound to [the affiliated corporation]." *Id.*

In addition, Burton Parsons received the right to grant licenses to manufacture EKG Sol for sale and distribution in foreign countries. If a manufacturing license were granted, plaintiff was to receive 30 percent of the royalties or other compensation paid to Burton Parsons by the foreign corporation. *Id.* ¶ 4.

The agreement required the company to maintain adequate records and gave plaintiff the right to inspect the books. *Id.* ¶ 12. Plaintiff also reserved the right to inspect the company's facilities to control the nature and quality of the product. *Id.* ¶ 9.

Plaintiff could terminate the agreement upon written notice if the company failed to pay any royalties within 60 days or otherwise breached the agreement. *Id.* ¶ 7. Likewise, the company could terminate the agreement if the manufacture of the invention became infeasible or undesirable for valid business reasons. *Id.* ¶ 8.

Upon execution of the license agreement, plaintiff had applied for, but had not received, the patents and registered trademark. In 1961, plaintiff assigned all his "right, title and interest" in the United States[3] and Canadian[4] patents for EKG Sol for ten dollars and one dollar, respectively. Exhibits 5, 7 to Statement of Points and Authorities in Support of Alcon's Motion for Partial Summary Judgment ("Motion of Alcon"). Plaintiff also assigned the registered trademark[5] to Burton Parsons at that time for "good and valuable consideration." Exhibit 9 to Motion of Alcon. None of the assignments explicitly mentioned the license agreement.

In April 1968, Burton Parsons informed plaintiff by letter that the method of computing his royalties on sales of EKG Sol in Canada was changed to conform with the "foreign licenses" provisions of the license agreement. Exhibit 10 to Motion of Alcon. The new royalty computation appeared on every quarterly royalty statement sent to plaintiff from 1968 through 1977. Defend-

---

**2.** Burton, Parsons & Company, Inc., a parent corporation of Burton Parsons Chemicals, Inc., was merged into defendant Alcon after August 1979. Answer of defendant Alcon ¶ 2.

**3.** The United States patent was not issued until March 27, 1962. The assignment is dated July 17, 1961, a few days after the Patent and Trademark Office gave notice that the patent would be granted. Motion of Alcon at 5, n. 4.

**4.** The Canadian patent was assigned on September 7, 1961, and issued in November 1961. *Id.* at 5.

**5.** The trademark was registered on June 2, 1959, and assigned to Burton Parsons on June 16, 1961.

ant Alcon's Statement of Material Facts as to Which There is No Genuine Issue ("Defendant Alcon's Statement of Material Facts") ¶ 5; *see, e.g.,* Exhibit 12 to Motion of Alcon.

Another change in the computation of royalties occurred in November 1974. Burton Parsons began deducting each month 7.025 percent from the gross sales of EKG Sol in the United States before computing plaintiff's royalty. The deduction was not noted on plaintiff's quarterly accountings, although it was set forth in the company's books and records. Plaintiff's Statement of Material Facts Not in Dispute ("Plaintiff's Statement of Material Facts") ¶ 4(b); Motion of Alcon at 7.

In September 1977, about one-and-a-half years before the expiration of the patent, Burton Parsons sold the EKG Sol product line and Canadian patent and trademark rights to Graphic Controls Corporation for $600,000.[6] Plaintiff's Statement of Material Facts ¶ 6. Prior to the closing of the sale, plaintiff accepted a one-time, lump-sum payment of $15,000 in full settlement of his remaining royalty rights under the license agreement. Defendant Alcon's Statement of Material Facts ¶¶ 3–4; *see* Exhibit 15 to Motion of Alcon.

Defendant Alcon acquired Burton Parsons two years after the sale of the EKG Sol product and patent and trademark rights. Plaintiff and defendant Alcon never had any direct dealings prior to the initiation of the instant lawsuit. Defendant Alcon's Statement of Material Facts ¶ 7.

Plaintiff claims that he was unaware of the 7.025 percent deduction until September 1982, when he was asked to testify in a case against Burton Parsons brought by another inventor for the identical discounting of sales. Plaintiff's Statement of Material Facts ¶ 8. In July 1983, plaintiff demanded that defendants Alcon and Manfuso pay to him all sums wrongfully withheld under the license agreement. *Id.* ¶ 9.

Plaintiff thereafter filed the instant action in which he claims: (1) breach of contract for failure to pay royalties due to him under the license agreement; (2) punitive damages for "wanton, malicious, intentional" breach of contract; (3) conversion and misappropriation of plaintiff's patent and trademark rights; (4) fraudulent inducement of plaintiff to accept the $15,000 final royalty payment; and (5) unjust enrichment. Amended Complaint ¶¶ 25–42.

*Conclusions of Law*

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure when no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Weiss v. Kay Jewelry Stores, Inc.,* 470 F.2d 1259, 1262 (D.C.Cir. 1972) (quoting *Traylor v. Black, Sivalls & Bryson, Inc.,* 189 F.2d 213, 216 (8th Cir. 1951)).

In Count I of the Amended Complaint, plaintiff seeks an accounting of the wrongfully withheld royalties. Amended Complaint ¶¶ 25–27. In Counts III, IV, and V, plaintiff seeks the proceeds of the 1977 sale of the patent and trademark rights to Graphic Controls Corporation. *Id.* ¶¶ 30–42.

Plaintiff's claims against defendant Alcon raise two general issues: (1) whether defendant fraudulently breached the license agreement by withholding royalty payments from sales of EKG Sol in Canada and the United States, and (2) whether a breach entitled plaintiff to terminate the patent and trademark assignments.

■ The sole material fact in dispute that bears upon these issues is whether plaintiff had actual or constructive knowledge of the 7.025 percent deduction in gross sales of EKG Sol in the United States. This question must be resolved at trial. The Court, however, may rule on the issues of breach of contract concerning the Canadian sales royalties and the right of

---

**6.** The United States patent on EKG Sol had been transferred to Hewlett Packard Company in 1975 for $110,000 in settlement of litigation between that company and Burton Parsons over the Canadian patent. Plaintiff's Statement of Material Facts ¶ 5; Motion of Alcon at 9 n. 5.

termination. All other material facts are undisputed and therefore the issues are properly before the Court for summary judgment.

The Court finds that plaintiff was informed of the change in computation of Canadian sales royalties in 1968, but failed to dispute the change. His claim, therefore, is barred by the statute of limitations. The Court also finds that the assignments were absolute and did not grant to plaintiff a right to revoke upon a breach of the license agreement. Thus, defendant Alcon's motion for partial summary judgment on Count I, concerning the Canadian royalties, and Counts III, IV, and V is granted.

In addition, plaintiff seeks punitive damages in Count II of the Amended Complaint for malicious breach of contract. Amended Complaint ¶¶ 28–29. Two threshold questions govern whether punitive damages may lie in this case. First, which jurisdiction controls? Second, does the controlling jurisdiction allow punitive damages for malicious breach of contract? The material facts that bear on these questions are not in dispute. Therefore, the punitive damages issue may properly be considered for summary judgment.

The Court finds that plaintiff is not entitled to punitive damages against defendant Alcon as a matter of law, and grants Alcon's motion for partial summary judgment as to Count II of the Amended Complaint.

### A. Count I: Royalties from Canadian Sales

Plaintiff alleged two breaches of the license agreement: (1) a wrongful recomputation of royalties from sales of EKG Sol in Canada, and (2) a unilateral deduction of 7.025 percent from gross sales in the United States before computation of plaintiff's royalties.[7] Motion of Plaintiff at 1–3.

As stated previously, the alleged breach involving the deduction from gross sales in the United States raises a question of material fact which must be resolved at trial.

The change in the computation of royalties from Canadian sales occurred in 1968. Before then, the sales by Burton Parsons's Canadian subsidiary were added to the sales in the United States. Plaintiff then received seven percent of the first $20,000 of "net sales" annually and five percent thereafter. Motion of Alcon at 26.

In January 1968, Burton Parsons licensed the Canadian subsidiary to manufacture its own supplies of EKG Sol. Paragraph 4 of the license agreement required Burton Parsons to pay plaintiff 30 percent of all royalties or other compensation that the company received from a foreign manufacturer. Exhibit A ¶ 4 to Amended Complaint.

Defendant Manfuso, as vice president of Burton Parsons, notified plaintiff of the change by letter dated April 4, 1968. The letter explained that the change occurred "since EKG Sol was being manufactured in Montreal, Canada by Burton, Parsons & Company of Canada Ltd., under a licensing agreement with Chemicals." Exhibit 10 to Motion of Alcon. Defendant Manfuso further stated that the change "really doesn't make much difference I don't believe, dollar and cents wise." *Id.* Plaintiff's next royalty statement for December 1967 and January and February 1968 noted the new method of computation. Exhibit 12 to Motion of Alcon.

Plaintiff did not object to the change in computation until shortly before the initiation of the instant action. Motion of Alcon at 27. Plaintiff now claims that Burton Parsons fraudulently withheld material facts concerning the change in computation of his royalties, thereby concealing the breach of the license agreement. Plaintiff contends that defendant Manfuso concealed that the Canadian subsidiary was wholly owned by Burton Parsons. In addition, plaintiff claims that defendant Manfuso "exploited his position of trust and confidence by making the obviously misleading

---

**7.** Plaintiff requested summary judgment on Count I and spoke only to the alleged breaches concerning the Canadian sales royalties and the 7.025 percent deduction. The Court recognizes only these claims for purposes of this action.

statement that the change 'doesn't really make much difference.'" Motion of Plaintiff at 2.

Defendant argues that plaintiff's claim is barred by the applicable statute of limitations. Plaintiff contends that the fraudulent concealment of material facts tolled the running of the statute until plaintiff's discovery of the breach in September 1982.

 In a diversity case, a federal court must apply the statute of limitations that the court of the forum state would apply. *Guaranty Trust Company v. York*, 326 U.S. 99, 110, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945). Which state's statute applies depends on the forum's choice-of-law rules. *Klaxon Company v. Stentor Electric Manufacturing Company, Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

The District of Columbia Court of Appeals has said explicitly that the question of whether an action is time-barred is procedural in nature and therefore governed by the statute of limitations of the forum. *Hoffa v. Fitzsimmons*, 673 F.2d 1345, 1360 n. 41 (D.C.Cir.1982) (citations omitted); *Steorts v. American Airlines, Inc.*, 647 F.2d 194, 197 (D.C.Cir.1981).

The statute of limitations for breach of contract and tort actions in the District of Columbia is three years. D.C.Code Ann. § 12–301(7), (8) (1981). The three-year period begins to run "from the time the right to maintain the action accrues." *Id.*

In the absence of fraud, the right to maintain a breach of contract action accrues when the contract was breached. *Poole v. Terminix Company of Maryland and Washington, Inc.*, 84 A.2d 699, 701 (D.C.1951), *aff'd*, 200 F.2d 746 (D.C.Cir. 1952). In the instant action, the alleged breach occurred in 1968 and continued through September 1977 when the license agreement terminated. Plaintiff, however, alleges fraudulent concealment of the breach.

Under District of Columbia law, the tolling of the statute of limitations requires either some affirmative act tending to conceal the cause of action or a misrepresentation, even if the misrepresentation does not hide the cause of action itself. *Richards v. Mileski*, 662 F.2d 65, 70 (D.C.Cir.1981).

"Concealment by mere silence is not enough. There must be some trick or connivance intended to exclude suspicion and to prevent discovery of the cause of action by the use of ordinary diligence." *Poole v. Terminix Company of Maryland and Washington, Inc.*, 84 A.2d at 702. *Accord William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C.1980); *Adrian v. American Security & Trust Company*, 211 A.2d 771, 772 (D.C.1965). Any statement, word, or act, however, which tends to suppress the truth may constitute fraudulent concealment. *William J. Davis, Inc. v. Young*, 412 A.2d at 1192. Even an innocent misrepresentation may toll the statute of limitations. *Keener v. Walker*, 256 A.2d 779, 781 (D.C.1969).

Once tolled by a positive act of concealment or a misrepresentation, the statute of limitations does not begin to run until the plaintiff discovers or should have discovered the wrong. *William J. Davis, Inc. v. Young*, 412 A.2d at 1191.

A well-established defense to a claim of fraudulent concealment is that the plaintiff knew, or by the exercise of due diligence could have discovered, that he may have a cause of action. *Estate of Chappelle v. Sanders*, 442 A.2d 157, 158 (D.C.1982); *Westinghouse Electric Corporation v. City of Burlington, Vermont*, 351 F.2d 762, 764 (D.C.Cir.1965). "The test of due diligence measures the plaintiff's efforts to uncover his cause of action against what a reasonable person would have done in his situation given the same information." *Richards v. Mileski*, 662 F.2d at 71.

 In the instant case, plaintiff was fully informed in writing of the change in computation of royalties from Canadian sales and the reason for the change. He was reminded continually of the change by the quarterly royalty statements which noted the new method of computation.

The Court rejects plaintiff's claims of fraudulent nondisclosure and misrepresentation. In the letter of April 1968, defendant Manfuso specified that the change was based on Burton Parsons's manufacturing license with Burton Parsons & Company of Canada Ltd. This information reasonably should have raised a suspicion that the companies were affiliated rather than "exclude a suspicion . . . of [plaintiff's] right of action." *Adrian v. American Security & Trust Company*, 211 A.2d at 772.

In addition, defendant Manfuso's statement of his opinion as to the importance of the change in computation did not amount to a fraudulent misrepresentation. Plaintiff had no right to rely on the opinion. Plaintiff possessed the ability to determine for himself the importance of the change. Defendant Manfuso did not claim to have any special expertise regarding this matter, nor did the parties as inventor and patentee have a fiduciary or confidential relationship. *Babb v. Bolyard*, 194 Md. 603, 72 A.2d 13, 16 (1950); *Restatement (Second) of Torts* §§ 542, 543 (1977); 37 Am.Jur.2d *Fraud & Deceit* § 265 (1968).

The Court finds that plaintiff knew or should have known of the alleged breach of the license agreement in 1968 and, therefore, his claim is barred by the statute of limitations.

### B. Count II: Punitive Damages

Under Count II of the Amended Complaint, plaintiff seeks punitive damages for alleged malicious breach of contract involving the nonpayment of royalties. Plaintiff alleges that defendant Alcon's breach was "wanton, malicious, intentional and in reckless disregard of Dr. Friedman's rights." Amended Complaint ¶ 29.

■ In considering a claim for punitive damages, the Court must decide which jurisdiction's law applies and then determine whether punitive damages are available under the applicable law. *Keene Corporation v. Insurance Company of North America*, 597 F.Supp. 934, 936 (D.D.C. 1984).

■ A choice-of-law issue in a diversity case is determined by the rules of the forum state. *Klaxon Company v. Stentor Electric Manufacturing Company, Inc.*, 313 U.S. at 496, 61 S.Ct. at 1021. District of Columbia courts employ an "interest analysis" approach, whereby the courts apply the law of the State with the most significant interest in the immediate controversy. *Keene Corporation v. Insurance Company of North America*, 597 F.Supp. at 938.

In the instant case, the "immediate controversy" is the availability of punitive damages. "When the primary purpose of a rule of law is to deter or punish conduct, the States with the most significant interests are those in which the conduct occurred and in which the principal place of business and place of incorporation of defendant are located." *Id.*

The parties in the instant case agree that the principal place of business of Burton Parsons controls. Motion of Plaintiff at 13; Opposition to Plaintiff's Cross Motion for Partial Summary Judgment and Reply Memorandum in Support of Alcon's Motion for Partial Summary Judgment ("Opposition of Alcon") at 20. Plaintiff claims that the company was headquartered at all times in Washington, D.C. Motion of Plaintiff at 13. Plaintiff cites the prefaces of the 1958 license agreement and 1977 sales contract with Graphic Controls Corporation, which refer to Washington, D.C., as the principal place of business. Exhibits 1, 14 at 1 to Motion of Alcon.

The evidence produced by defendant Alcon, and undisputed by plaintiff, demonstrates that Burton Parsons moved its headquarters to Maryland in 1962. The company's mailing address, however, continued to be Washington, D.C. Declaration of Marjorie Jo Rumrill (attached to Opposition of Alcon); Exhibits A, B to Opposition of Alcon.

■ The Court finds the mailing address of a corporation not controlling. The interest of the State of the principal place of business is in punishing or protecting a

resident corporation for specific conduct. *Keene Corporation v. Insurance Company of North America,* 597 F.Supp. at 940. The quirks of the postal service in determining postal zones does not give Washington, D.C., a greater interest in the punitive damages issue than the State of residency.

The only wrongdoing alleged properly against defendant Alcon pertains to the discounting of gross sales in the United States beginning in 1974, after the company's move to Maryland. Any wrongful nonpayment of royalties and false accountings would have occurred at the company's headquarters. Thus, the place of conduct, as well as the principal place of business of Burton Parsons in 1974, was Maryland. These relationships to the controversy give Maryland a substantial interest in the punitive damages issue. No State has a stronger interest. The Court, therefore, will apply Maryland law.

Maryland courts follow the general rule of disallowing punitive damages in pure breach of contract actions. *General Motors Corporation v. Piskor,* 281 Md. 627, 381 A.2d 16, 22 (1977). The courts recognize, however, a gray area between pure tort and pure contract actions. In this gray area, the courts allow punitive damages for torts arising from a contractual relationship, but only if actual malice is shown. *Id.,* 381 A.2d at 22–23; *Aeropesca Limited v. Butler Aviation International, Inc.,* 44 Md.App. 610, 411 A.2d 1055, 1064 (1980); *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48, 52–53 (1975).

Recovery is limited to cases where the conduct clearly warrants punitive damages. "... We do not mean to say there may not be [punitive] damages in cases of this character, for if, for example, there was evidence tending to show that the defendant had caused the contract to be broken for the *sole purpose, and with the deliberate intention of wrongfully injuring* the plaintiff, exemplary damages might be recovered, but when the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason

for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it. ..." (emphasis added). *H & R Block, Inc. v. Testerman,* 338 A.2d at 53 (quoting *Knickerbocker Company v. Gardiner Company,* 107 Md. 556, 69 A. 405, 410 (1908)).

The Maryland courts have defined actual malice as "the performance of an act ... with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Id.,* 338 A.2d at 52. Deliberate violation of a known right without legal justification will not support an award for punitive damages in a tort action arising from a contractual relationship. *Food Fair Stores, Inc. v. Hevey,* 275 Md. 50, 338 A.2d 43, 47 (1975). Nor is evidence of a motive of greed or a desire to maximize profits sufficient. *Aeropesca Limited v. Butler Aviation International, Inc.,* 411 A.2d at 1065; *H & R Block, Inc. v. Testerman,* 338 A.2d at 54.

█ Plaintiff in the instant case presented no evidence that Burton Parsons harbored any ill will toward plaintiff, nor that it acted with "an evil or rancorous motive influenced by hate." The company may have acted with wanton or reckless disregard of plaintiff's rights, but this does not constitute actual malice as required by the Maryland courts. *Aeropesca Limited v. Butler Aviation International, Inc.,* 411 A.2d at 1065. The Court, therefore, dismisses Count II of the Amended Complaint.

C. Counts III, IV, and V: Proceeds of Sale of Patent and Trademark Rights

Plaintiff further claims a right to the proceeds of the 1977 sale of the EKG Sol patent and trademark rights to Graphic Controls Corporation under the theories of conversion and misappropriation, fraudulent inducement, and unjust enrichment. Amended Complaint ¶¶ 30–42.

Plaintiff argues that the 1961 assignments and the original 1958 license agreement constituted the same transaction. Therefore, the right to terminate under the license agreement for nonpayment of royalties applied equally to the subsequent as-

signments. Plaintiff further contends that by concealing their breach of the license agreement, defendants denied plaintiff the right to revoke the assignments. Plaintiff was deprived thereby of the value of the patent and trademark rights which he would have reacquired upon notice of the breach. Motion of Plaintiff at 6–11.

■ Plaintiff's claims under Counts III, IV, and V of the Amended Complaint depend on the existence of his right to terminate the assignments. The Court disagrees with plaintiff's "same transaction" argument and finds that he unconditionally assigned his rights under the patents and trademark to Burton Parsons.

The assignments on their face are absolute. Contrary to plaintiff's statement, the assignments do not "refer back explicitly to the License Agreement." *Id.* at 6. The United States patent assignment recites the same patent application date of December 30, 1957 and the same application number as does the license agreement. In addition, the trademark assignment is effective *nunc pro tunc* as of February 3, 1958, the date of the license agreement. Exhibits B, C to Amended Complaint.

■ Explicit reference to the license agreement is not necessary if the documents pertain to the same transaction. "Where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other." 17A C.J.S. *Contracts* § 298 (1963); *see Helvering v. Le Gierse,* 312 U.S. 531, 540, 61 S.Ct. 646, 649, 85 L.Ed. 996 (1941); *Restatement (Second) of Contracts* § 202(2) (1981). This rule of construction, however, may not be applied mechanically, without regard to the particular circumstances of each case.

If documents are in fact independent, they may not be considered together even though they involve the same parties or the same subject matter. 17A C.J.S. *Contracts* § 298.

■ The license agreement and assignments in the instant case do not constitute the "same transaction." Although the agreements all transfer some rights in EKG Sol to Burton Parsons, the legal relationships created thereby are different. The license agreement granted a mere license "to manufacture, promote, sell and distribute" the invention.[8] Exhibit A ¶ 2 to Amended Complaint. The assignments, on the other hand, granted to Burton Parsons a proprietary interest in the patents and registered trademark. *See Positype Corporation of America v. Mahin,* 32 F.2d 202, 204 (2d Cir.), *cert. denied,* 280 U.S. 575, 50 S.Ct. 30, 74 L.Ed. 626 (1929).

■ The assignments recited separate considerations and were executed more than three years after the license agreement. The parties could have executed the assignments and license agreement contemporaneously. An assignment before the issuance of the patent is not invalid. *Hendrie v. Sayles,* 98 U.S. (8 Otto) 546, 549, 25 L.Ed. 176 (1878); *Kenyon v. Automatic Instrument Company,* 160 F.2d 878, 882 (6th Cir.1947); *Lamar v. Granger,* 99 F.Supp. 17, 36 (W.D.Pa.1951).

In addition, circumstances between the parties changed after execution of the license agreement. Under the license agreement, the parties intended that plaintiff prosecute the pending United States patent application. Exhibit A ¶ 1 to Amended Complaint. The patents then would be granted in his name. *Id.* at 2 ¶ 3, 3 ¶ 5. Several events occurred, however, that necessitated prosecution of the patent by

---

**8.** A grant of the exclusive right to make, use, and sell an invention during the term of the patent is an assignment rather than a license as a matter of law, unless the parties evidence a contrary intent. *Kronner v. United States,* 110 F.Supp. 730, 734–35, 126 Ct.Cl. 156 (1953); *Eterpen Financiera Sociedad de Responsabilidad Limitada v. United States,* 108 F.Supp. 100, 104, 124 Ct.Cl. 20 (1952), *cert. denied,* 346 U.S. 813, 74 S.Ct. 22, 98 L.Ed. 340 (1953).

In the instant case, the license agreement grants to Burton Parsons all of plaintiff's rights to the invention. The agreement, however, evidences the parties' intent not to assign the patent. Twice the agreement refers to the patent being granted subsequently to plaintiff. Exhibit A at 2, 3 to Amended Complaint. In addition, plaintiff retained the right to inspect the company's facilities to ensure the quality of the invention. *Id.* ¶ 9.

Burton Parsons. Motion of Alcon at 5. Thereafter, upon notice that the patent would be granted, plaintiff assigned the patent to Burton Parsons. The patent was issued directly to the company as assignee. *Id.*

Plaintiff also reserved the right under the license agreement to inspect Burton Parsons's facilities as required by the holder of a registered trademark. By acquiring the trademark, Burton Parsons relieved plaintiff of the obligation to ensure the quality of the goods sold under the mark as of the effective date of the assignment. Motion of Alcon at 6.

The Court may not overlook these events in interpreting the relationship of the documents. The Court finds that the license agreement and assignments constituted separate legal transactions and that the assignments were absolute. A right to revoke the assignments did not arise from the nonpayment of royalties. Plaintiff's cause of action is limited to breach of contract. *Hartshorn v. Day,* 60 U.S. (19 How.) 211, 222, 15 L.Ed. 605 (1856).

The Court, therefore, grants defendant Alcon's motion for partial summary judgment and denies the cross-motion of plaintiff. The Court filed an order to this effect on February 6, 1985.