**VULCAN ARBOR HILL CORPORATION, a/k/a Arbor Hill Associates, et al., Appellants,**

v.

**Robert B. REICH, Secretary, Department of Labor and Henry Cisneros, Secretary, Department of Housing and Urban Development, Appellees.**

No. 95–5162.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 1996.

Decided April 19, 1996.

Karen M. Lockwood, Washington, DC, argued the cause for appellants, with whom William J. Rodgers and Charles B. Long were on the briefs.

Robert M. Loeb, Attorney, United States Department of Justice, argued the cause for appellees, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Douglas N.

Letter, Litigation Counsel, United States Department of Justice, were on the brief.

Before: EDWARDS, Chief Judge, and WALD and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge HENDERSON.

WALD, Circuit Judge:

The developer of a project partially financed by the Department of Housing and Urban Development ("HUD") to rehabilitate 82 dilapidated row houses in inner-city Albany, New York appeals a determination by the Wage and Appeals Board of the Department of Labor ("Board") that it was required to pay "prevailing" wages as determined under the Davis–Bacon Act, 40 U.S.C. § 276a, to laborers who worked on the rehabilitation of the houses. The Board based its decision on section 110 of the Housing and Community Development Act, 42 U.S.C. § 5310, which requires recipients of HUD grant funds to pay Davis–Bacon wages provided the property at issue "is designed for residential use for eight or more families." The developer, Arbor Hill, argued that section 110 did not apply because each separate building being renovated contained fewer than eight residential units. Arbor Hill also argued that HUD, not the Department of Labor, had primary responsibility for interpreting section 110. The Board, however, refused to accord HUD's interpretation of section 110 deference, and held that this project was covered by Davis–Bacon because the residential units in each of the 82 houses under rehabilitation must be aggregated for the purpose of applying the eight-unit threshold. The district court affirmed this decision, 1995 WL 774603, holding that the Department of Labor, not HUD, is principally charged with interpreting section 110, and that its interpretation was correct in this case. In addition, the district court agreed with two of the three members of the Board who, writing separately, had found that irrespective of section 110, Arbor Hill had contractually agreed to pay Davis–Bacon wages in a legally binding agreement with the City of Albany. We affirm the district court's judgment on this latter ground, finding that Arbor Hill did, in fact, *contractually* agree to pay Davis–Bacon wages. Thus we do not reach the issue of whether Arbor Hill was *statutorily* required to pay Davis–Bacon wages or which agency has been delegated authority to interpret section 110.

## I. Background

### A. *Statutory and Regulatory Framework*

The Davis–Bacon Act, 40 U.S.C. § 276a, was passed during the Great Depression "to ensure that workers on federal construction projects would be paid the wages prevailing in the area of construction." *Building & Const. Trades' Dep't, AFL–CIO v. Donovan,* 712 F.2d 611, 613 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984). The Act was aimed at preventing companies from competing for contracts by bringing in laborers from distant areas who would work for substandard wages. Under the Act, the Secretary of Labor sets "prevailing" minimum wage rates which contractors must pay to their employees on any construction project over $2,000 to which the United States is a party. *See* 40 U.S.C. § 276a(a).

Although the Davis–Bacon Act by its terms applies only to contracts to which the United States is a party, there are more than 50 other statutes which require contractors to pay Davis–Bacon wages under contracts to which the United States is not a party, but which are financed in whole or in part with federal funds. *See* 29 C.F.R. Part 1, App. A (1995) (collecting statutes). These statutes run the gamut of federal activities, from housing to highway construction to pollution control.

One of these Davis–Bacon related provisions, section 110 of the Housing and Community Development Act of 1974, 42 U.S.C. § 5310, is at the vortex of this dispute. At the time of the events here, section 110 provided:

> All laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed in whole or in part with assistance received

under this chapter shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis–Bacon Act.... *Provided,* that this section shall apply to the rehabilitation of residential property only if such property is designed for residential use for eight or more families. The Secretary of Labor shall have, with respect to such labor standards, the authority and functions set forth in Reorganization Plan Number 14 of 1950.[1]

The "Reorganization Plan" referred to in section 110 was originally promulgated by President Truman, and confers on the Department of Labor the authority and responsibility to coordinate the enforcement not only of the Davis–Bacon Act itself, but also Davis–Bacon related statutes. The Plan provides:

> In order to assure coordination of administration and consistency of enforcement of labor standards provisions of each of the following Acts by the Federal agencies responsible for the administration thereof, the Secretary of Labor shall prescribe appropriate standards, regulations and procedures, which shall be observed by these agencies....

Reorganization Plan No. 14 of 1950, *reprinted at* 5 U.S.C.A.App. at 242.

Under this framework, the contracting agency (here, HUD) has the "initial responsibility for determining whether a particular contract is subject to the Davis–Bacon Act." *Universities Research Ass'n v. Coutu,* 450 U.S. 754, 760, 101 S.Ct. 1451, 1456, 67 L.Ed.2d 662 (1981); *see also* 29 C.F.R. § 5.5(a). If Davis–Bacon applies, the contracting agency determines the "prevailing" wages, either by consulting wage rates published in the Federal Register, or by requesting a project wage determination from the Wage and Hour Division of the Department of Labor. *See Id.* §§ 1.5, 1.6. The determination made by the contracting agency is "subject to administrative review" by the Department of Labor. *Coutu,* 450 U.S. at 760, 101 S.Ct. at 1456. The first step in the appeal process is to request a ruling from the Wage and Hour Administrator of the Department of Labor. *Id.* § 5.13. A dissatisfied party may then appeal further to the Board, which renders a final agency decision on the matter. *See Id.* § 7.1(d).

B. *Factual and Procedural Background*

This case involves a project in inner-city Albany to renovate 82 dilapidated residential row-houses—a project financed in part by a grant from HUD to the City of Albany. The project developer, Arbor Hill, planned to purchase each of these 82 buildings prior to renovation, and then to hire mostly local, inner-city residents to do the rehabilitation work. After the renovations were completed, Arbor Hill would own and manage the buildings for at least 12 years before selling them back to individual buyers. The total cost of the project was estimated at $13 million.

1. *Arbor Hill's Contractual Agreement*

Prior to the city's securing the grant, Arbor Hill wrote to HUD's Washington, D.C. office on September 20, 1984, discussing the financing details of the project, the construction schedule, and then, in its concluding sentence stating that "Developer acknowledges that with the guidance of the Buffalo area office of the U.S. Dept. of Housing and Urban Development that if Davis–Bacon is required by the area office, such wages will be paid by the developer." Letter from Mark J. Simmons to Stanley Newman, *reprinted in* App. 510. This sentence, Arbor Hill would later contend, reflected its belief that it was not clear whether Davis–Bacon wages would be required and that it intended to pay them only if the Buffalo HUD office so required. *See* Affidavit of Mark Simmons, *reprinted in* App. 733.

Three months later, on December 27, 1984, HUD approved the $3.5 million grant to the City of Albany, under the Urban Develop-

1. Section 110 was amended by Pub.L. No. 100–242, § 523 (1987), which replaced the phrase "is designed for residential use of eight or more families" with "contains not less than 8 units." All further references to section 110 are to the version of the Act in effect before the 1987 amendment.

ment Action Grant program of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301, *et seq.*[2] Contemporaneously with the approval of the grant, HUD and the city signed a "Grant Agreement," which contemplated a starting date of July 1, 1985 for the rehabilitation work. The Grant Agreement also provided that "[p]articipating Parties will, prior to any use of grant funds for the Project, enter into *legally binding agreements* evidencing the commitments which were so relied upon by the Secretary." Grant Agreement § 10.01, *reprinted in* App. 112 (emphasis supplied). Thus, as a condition of the grant, Arbor Hill and the City of Albany were required to enter into a legally binding agreement before any funds could be expended.

Before Albany and Arbor Hill entered into their agreement, W. Vito Zambelli, the Director of Labor Relations for HUD's Buffalo Area Office, sent a letter to the Albany Urban Renewal Agency, the city agency in charge of the project. In his February 7, 1985 letter, Zambelli enclosed a copy of the "Wage Decision" issued by the Department of Labor for the Arbor Hill project, which set forth in minute detail the hourly rates, fringe benefits, and paid holidays required for each classification of worker, in accordance with Davis–Bacon. *See* App. at 465. Zambelli directed that *"[t]his decision should be reproduced and incorporated into the contract specifications before release to prospective bidders." Id.* (emphasis supplied). Although this letter put Arbor Hill on notice that the Department of Labor believed Davis–Bacon wages applied, and that HUD's Buffalo Office intended to enforce the application of Davis–Bacon, Arbor Hill lodged no protest at that time.

Instead, on April 1, 1985, Arbor Hill entered into the legally binding agreement with the City of Albany required under the Grant Agreement. That document, entitled "Legally Binding Commitment (LBC) City of Albany, Albany Local Development Corporation and Arbor Hill Associates," specified project details both large (*e.g.,* how much money would be loaned) and small (*e.g.,* that Arbor Hill would post a HUD-approved sign at the project). *See* LBC, *reprinted in* App. 354–60. The document included the following critical clause:

> Arbor Hill Associates agrees that it will require its Construction Manager and those parties who are its prime and subcontractors to *comply with the provisions of the Davis–Bacon Act.*

App. 357 (emphasis supplied).

2. *Arbor Hill's Protest*

Arbor Hill first protested the Davis–Bacon wages almost two months after signing the Legally Binding Commitment, when it wrote a letter to HUD's Washington, D.C. office objecting both to the *calculation* of the wages (claiming they were inaccurate and substantially above actually prevailing rates) and also to the very *applicability* of the Davis–Bacon wage requirements. Letter of May 22, 1985, *reprinted in* App. 444–45. According to Arbor Hill, the proviso in section 110 that "this section shall apply to the rehabilitation of residential property *only if such property is designed for residential use for eight or more families*" (emphasis supplied) exempted this project from paying Davis–Bacon wages. In Arbor Hill's view, even though the project involved the rehabilitation of 82 houses, each of the houses was a separate *property,* with a separate deed, separate gas and electric meters, separate tax assessments, etc. Since none of the houses contained more than five residential units, Arbor Hill argued that the entire project fell within the section 110 exception.

HUD's Washington, D.C. office never replied to this letter, and Arbor Hill began a series of correspondence with HUD's Buffalo Area Office. In letters communicating increasing urgency, Arbor Hill asked Mr. Zambelli to rule that the project fell within the section 110 exception, and thus that Davis–Bacon wages need not be paid. *See* Letter of July 15, 1985, *reprinted in* App. 333; Letter of August 22, 1985, *reprinted in* App. 171.[3]

2. The City intended to lend this money to Arbor Hill for the rehabilitation project.

3. Separately, in a June 5, 1985 letter to the Department of Labor, Arbor Hill had challenged the calculation of the wage rates, though not the applicability of Davis–Bacon. *See* App. 437.

On September 27, 1985, Zambelli wrote to Arbor Hill, informing the developer that he had accepted its argument that the exception to section 110 applied to this project, and thus that Davis–Bacon wages were not required. Zambelli made no particular representation with respect to his authority to rule on the matter, but did say that "[t]his exemption has been consistently applied by the Department [of HUD] for the past twelve years for rehabilitation and new construction, whether the project consists of a single property with fewer than eight units or several properties each with fewer than eight units."

In the meantime Arbor Hill had signed a construction agreement with co-appellant Barry, Bette & Led Duke Residential, Inc. ("BBLR"), the general contractor. That agreement did not explicitly state whether Davis–Bacon wages were required, but instead said that the contractor agreed to pay Davis–Bacon wages "if applicable." In August, 1985, construction began on the project. The contractor was able to hire a large percentage of local, minority workers, but for wages below those required by Davis–Bacon.

In December, 1985, HUD's Associate General Counsel in Washington repudiated Zambelli's interpretation of section 110.[4] Relying on precedents for aggregating the units in a project to determine whether section 110 applied, the Associate General Counsel advised Arbor Hill that it was required to pay Davis–Bacon wages, retroactive to the start of construction. Arbor Hill was advised that it could present further arguments to HUD's General Counsel and/or could appeal to the Wage and Hour Administrator of the Department of Labor.

3. *Arbor Hill's Appeals*

Arbor Hill appealed this HUD determination to the Wage and Hour Administrator of the Department of Labor,[5] who issued an opinion finding that Arbor Hill was required to pay Davis–Bacon wages. Arbor Hill then filed a civil action in the district court challenging the Administrator's decision, but the court dismissed the action, finding that Arbor Hill must first exhaust administrative remedies by petitioning for review by the Department of Labor's Wage Appeals Board. The Wage Appeals Board subsequently affirmed the Administrator's decision, in a split decision. The "Decision for the Wage Appeals Board" found that HUD's interpretation of section 110 was not entitled to deference, and concluded that "the developers [were], in reality, treating this undertaking as one entire property," because:

> The UDAG grant provides funds directly for the construction of the entire undertaking; all the structures are under one common ownership; the general contractor and subcontractors are performing interchangeably on all the structures; and petitioners indicated that the laborers and mechanics were also performing activities if not on all the structures, at least on more than one.

Decision of the Wage Appeals Board, *reprinted in* App. 651. The Chairman of the three-member Board wrote a separate concurring opinion, agreeing with the Board's analysis of section 110. *Id.*, Statement of Chairman Bramow, *reprinted in* App. 662. In addition, Chairman Bramow opined that Arbor Hill had contractually agreed to pay Davis–Bacon wages:

> Also, it appears from the facts of this case that the question of Davis–Bacon coverage is moot. The specifications which have been made a part of petitioners' contract contain Davis–Bacon coverage. Therefore by contract petitioners have agreed to apply the Davis–Bacon labor standards. Under these circumstances, the petitioners cannot be permitted to circumvent their agreed-to obligations under the contract.

*Id., reprinted in* App. 663. Member Rothman, in an opinion concurring and dissenting,

4. This action was apparently prompted by requests from area unions.

5. While this matter was still under consideration, on February 14, 1986, the General Counsel of HUD wrote to the Department of Labor, saying that HUD had again changed its position and had decided that for ease of administration it was better to consider this project on a property-by-property basis, rather than aggregating the properties. Thus, HUD urged the Department of Labor to find that Arbor Hill was not required to pay Davis–Bacon wages.

agreed with Chairman Bramow that Arbor Hill had contractually agreed to pay Davis–Bacon wages:

> There is nothing that prohibits a recipient of federal financial assistance from agreeing in a Legally Binding Commitment to apply Davis–Bacon to the undertaking.... There I would end the decision and the holding in this case.

*Id.*, Statement of Member Rothman, *reprinted in* App. 668. Rothman also argued that Arbor Hill's petition for review was untimely:

> If a HDCA participant believes Davis–Bacon does not apply and does not want to commit to pay the Davis–Bacon wage predeterminations, that is a matter to be resolved before the *quid pro quo* grant is given.

*Id.*[6] In sum, two of three Board members (Bramow and Dunn) believed that section 110 covered this project; two (Bramow and Rothman) believed that Arbor Hill was obliged in any case to pay Davis–Bacon wages due to its legally binding commitment; and one (Rothman) believed that Arbor Hill's petition for review was untimely.

Arbor Hill filed a civil action to have the Board's decision vacated, and the district court granted summary judgment in favor of the government. The court found that the Department of Labor has primary responsibility for interpreting section 110, and that the Board's interpretation in this case was reasonable. In addition, the district court found that Arbor Hill had entered into a "binding contract" to ensure that Davis–Bacon wages were paid, rejecting Arbor Hill's contention that it had only conditionally agreed to pay Davis–Bacon wages. Arbor Hill appeals the district court's decision here.

## II. Discussion

On appeal, Arbor Hill raises several claims: It asserts that HUD, not the Department of Labor, is charged with interpreting the scope of section 110, and that the Wage Appeals Board and the district court erred in ruling that the Arbor Hill Project came under section 110. In addition, Arbor Hill claims that even if the project falls within section 110, the government should be estopped from retroactively enforcing Davis–Bacon because of the representations made by the Buffalo HUD office that Davis–Bacon wages would not apply. Arbor Hill also claims that the Wage Appeals Board hearing was tainted by bias and that the Board improperly failed to grant it an evidentiary hearing. Finally, Arbor Hill argues that the Board and the district court erred in finding that it had contractually agreed to pay Davis–Bacon wages regardless of any legal requirement to do so. We are persuaded that Arbor Hill did in fact unambiguously commit itself to paying Davis–Bacon wages in its April 1, 1985 Legally Binding Commitment, and accordingly, affirm the district court's decision on that ground.

### A. *Contract Issue*

It is axiomatic that even if a contractor or developer is not required by force of statute to pay Davis–Bacon wages, it can nonetheless bind itself to do so by contract. *See Woodside Village v. Department of Labor*, 611 F.2d 312 (9th Cir.1980). As the Ninth Circuit in *Woodside* aptly noted:

> [I]f the Davis–Bacon Act applies to a contract, the contractor must pay [prevailing] wages.... But the converse is not necessarily true. Nothing in the Davis–Bacon Act precludes the parties from contracting with reference to it, even if by proper interpretation its requirements may not have been applicable by force of law to the project in question.

*Id.* at 315 (internal citation omitted);[7] *see also Walsh v. Schlecht*, 429 U.S. 401, 411, 97

6. Member Rothman, however, disagreed with the majority's interpretation of section 110.

7. Our recent decision in *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C.Cir.1994), is not to the contrary. In *Ball, Ball & Brosamer* the Secretary of Labor had attempted to foreclose judicial review of his decisions by requiring, in a regulation, that the parties insert a sentence in every contract providing that "[a]ll rulings and interpretations of the Davis–Bacon and Related Acts contained in 29 C.F.R. Parts 1, 3, and 5 are herein incorporated by reference in this contract." *See id.* at 1449. The court found that the Secretary was attempting by this device to force every contracting party to agree in advance to the Secretary's interpretations of statutory terms

S.Ct. 679, 686–87, 50 L.Ed.2d 641 (1977) (the Davis–Bacon Act's "objective [of protecting workers from substandard wages] is clearly not 'frustrated' when contractual arrangements between employers and their employees result in higher compensation and benefits than the floor established by the Act"). Here as in *Woodside Village,* we find that Arbor Hill contractually committed itself to pay Davis–Bacon wages in its Legally Binding Commitment with the city, and it is on that ground we rest our decision.

Arbor Hill of course disputes that it contractually agreed to pay Davis–Bacon wages. It argues to us, at it did to the district court, that in construing the "contract" we must consider not only the Legally Binding Commitment of April 1, 1985, but also the other documents signed by Arbor Hill in the same time period, including—most importantly—the letter that Arbor Hill's President sent to HUD's Washington office in September, 1984 (the "September Letter"), in which Arbor Hill said it would pay Davis–Bacon wages if the Buffalo HUD office determined such wages were required. Finally, Arbor Hill notes that when it entered into the construction agreement with general contractor BBLR in June, 1985, the agreement said that BBLR was required to pay Davis–Bacon wages only "if applicable." These documents, Arbor Hill claims, when read *in pari materia,* show that it never intended to commit itself to paying Davis–Bacon wages in the Legally Binding Commitment unless HUD's Buffalo Office determined that such wages were required.

We do not find this argument persuasive, because the language of the Legally Binding Commitment is not in the least ambiguous: **"Arbor Hill Associates agrees that it will require its Construction Manager and those who are its prime and sub-contractors to comply with the provisions of the Davis–Bacon Act."** Arbor Hill's defense to the import of these words is that "the language in the legally binding commitment, cited by the district court, does not have a 'clear meaning' so as to bar other evidence of the intentions of the parties." Brief for Appellant at 36. Arbor Hill, however, tellingly fails to provide us with any other reasonable meaning as to which the seemingly plain words are susceptible.[8] *Cf. Wards Co. v. Stamford Ridgeway Associates,* 761 F.2d 117, 120 (2d Cir.1985) ("We stress that the meaning urged by the non-moving party must be 'fairly reasonable,' for, indeed, it is the rare sentence that cannot be read in more than one way if the reader is willing either to suspend the rules of common English usage or ignore the conventions of a given commercial setting.").

If the Legally Binding Commitment had said only that "Arbor Hill agrees to comply with section 110," then Arbor Hill would have a better case that the language was ambiguous. A promise to comply with section 110 could mean one of two things: (1) that Arbor Hill conceded that section 110 applied to it, and would pay Davis–Bacon wages or (2) that Arbor Hill believed it fell under the exception contained within section 110, and thus did not need to pay Davis–Bacon wages. Either way, Arbor Hill would be "complying"

such as "employed directly upon the site of the work." *Id.* (citing Davis–Bacon Act).

Such contractual language, we held, was unenforceable, because "[t]he Secretary ... cannot adopt regulations erasing the presumption of reviewability embodied in the APA...." *Id.* at 1450. Here, however, Arbor Hill had a choice between acceding to the Davis–Bacon directive of February, 1985 or administratively challenging it. The choice of contract language was left up to Arbor Hill and the City of Albany, and was not, as in *Ball, Ball & Brosamer,* compelled by any regulation aimed at precluding judicial review.

8. In all the cases cited by Arbor Hill for a contrary result, the court was presented with a contract which was clearly ambiguous, or where the party claiming ambiguity could articulate a definite and different meaning. *E.g., Davis v. Chevy Chase Fin. Ltd.,* 667 F.2d 160, 169–70 (D.C.Cir. 1981) (one paragraph of agreement used language "shall sell" to describe the mandatory nature of appellant's obligation to tender shares, while another paragraph used language "shall first offer"); *Wards Co.,* 761 F.2d at 120 (each side believed the contractual phrase "without the consent of lessor" modified a different clause); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975) (contract was not clear as to whether a "replacement" building must be of comparable size as the original building or whether the insured could collect the full insurance amount when it replaced the damaged building with a smaller one).

with section 110. But the Legally Binding Commitment, rather than committing Arbor Hill to comply with section 110, committed it to "comply with the provisions of the Davis–Bacon Act," and there was only one way to "comply" with Davis–Bacon—by ensuring that prevailing wages were paid.

Where the language of a contract is wholly unambiguous, we will not consider extrinsic evidence of the parties' intent. *Compare American Postal Workers Union v. United States Postal Serv.,* 940 F.2d 704, 707–08 (D.C.Cir.1991) ("In the absence of ambiguity in the collective bargaining agreement, however, we have not cause to examine extrinsic evidence of the parties' intent.") *with Wilson & Sons Heating & Plumbing v. N.L.R.B.,* 971 F.2d 758, 761 (D.C.Cir.1992) ("in light of the linguistic ambiguity we press on to examine the extrinsic evidence"). Because we believe the language of the contract was unambiguous in this instance, we do not find it necessary or helpful to consult the extrinsic material pressed on us by Arbor Hill.

Moreover, the clarity of the words in the LBC is not diminished even when those words are read along with the language in the Grant Agreement between Arbor Hill and HUD. Our dissenting colleague is correct that the Grant Agreement incorporated the grant application, and that the application included the September Letter, in which Arbor Hill said "Developer acknowledges that with the guidance of the Buffalo area office of the U.S. Dept. of Housing and Urban Development that if Davis–Bacon is required by the area office, such wages will be paid by the developer." *See* Diss.Op. at 1123–24. However, even assuming that this language from the September letter does say that Arbor Hill would pay Davis–Bacon wages *only if* the Buffalo office so required, we do not agree that its incorporation by reference into the Grant Agreement introduces ambiguity into the otherwise unequivocal language of the LBC.

The Grant Agreement, as our colleague admits, did not represent the final word on the obligations of Arbor Hill. *See* Diss.Op. at 1122–23. To the contrary, the Grant Agreement required Arbor Hill and Albany to enter into a separate Legally Binding Commitment, and only when the LBC was approved by HUD would the funds for the project be released. *See also* 24 C.F.R. § 570.460(c)(5) (preliminary approval becomes final only after HUD has reviewed and approved the Legally Binding Commitment). Thus even if HUD and Arbor Hill *preliminarily* agreed that payment of Davis–Bacon wages would be conditional, the *final* agreement was that Arbor Hill would "comply ... with Davis–Bacon." [9] To allow an earlier understanding to trump a clearly expressed subsequent agreement would be contrary to the general rule of contract interpretation whereby "If the beneficiary (C) consents, the promisor (A) and promisee (B) are generally free to make a subsequent agreement that will modify the promisor's duty to the beneficiary." [10] E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS, § 10.8 (1990).

Indeed, in a similar situation, the Eighth Circuit held that an agreement entered into as a condition precedent to the federal government's release of funds should control over a conflicting provision, even where the two documents were interpreted together. In *Dakota Gasification v. Natural Gas Pipeline Co.,* 964 F.2d 732 (8th Cir.1992), a group of gas pipeline companies entered into a partnership agreement, one term of which required the parties to submit any dispute to arbitration. At the same time, the partner-

9. It is true that the LBC incorporates the grant agreement by reference in those instances where the grant agreement's terms "are pertinent and apply." *See* LBC, *reprinted in* App. 354. But we fail to see how this general incorporation clause could possibly mean that the unambiguous promise made by Arbor Hill in the LBC itself could be somehow rendered ambiguous by an earlier contradictory statement incorporated by reference in the Grant Agreement. Though mindful of the requirement that we should strive to give effect to all provisions of a contract (or contracts being interpreted together), the absolutely clear language in the LBC would have to be bent totally out of shape to bring it into accord with the language of the September Letter.

10. Here the *promisor* in the LBC was Arbor Hill, the *promisee* was the City of Albany, and the *beneficiary* of the LBC was HUD.

ship signed an agreement with the federal government in order to get a $1.5 billion loan to build a coal gasification plant, under which the parties agreed that any dispute would be litigated in United States District Court. When the government transferred operation of the plant to a private operator and a dispute arose, the gas companies asserted that the original arbitration agreement should control. The court disagreed, however, finding that since the signing of the agreement with the federal government was a "condition precedent" to obtaining the federal loan, even if the two contracts were interpreted together, the promise on which the federal government relied in releasing the funds had to control. *Id.* at 735–36. Similarly, in this case, the Grant Agreement specifically required the parties to "enter into legally binding agreements evidencing the commitments which were so relied upon by the Secretary," and thus the unconditional promise to comply with Davis–Bacon, on which HUD relied on in releasing the grant funds, must control.[11]

Though we are convinced that Arbor Hill's obligation was unambiguous, we do note that in the context of the events of late 1984 and early 1985 to which we have alluded, it is entirely understandable that Arbor Hill would have made such a promise to pay Davis–Bacon wages.[12] In February, Arbor Hill, through the Albany Urban Renewal Agency, was sent a letter setting forth the Davis–Bacon wage rates that would be required for the project and instructing it to put those wage rates into its contract specifications.[13] As of April 1, when it signed the Legally Binding Commitment with Albany, Arbor Hill had lodged no challenge or protest to the applicability of these Davis–Bacon wage determinations. Although Arbor Hill repeatedly stresses that its earlier, September letter clearly established its position that it would pay Davis–Bacon wages only if the Buffalo office required them, in February

11. The case authority cited by the dissent is not to the contrary. In *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49 (2d Cir.1993), two companies (one of which had bought the assets of another) had entered into two separate agreements which addressed the question of whether the purchaser was required to indemnify the seller in the event of future lawsuits. Although the Second Circuit approved of looking at both agreements in determining whether the purchase had agreed to indemnify, it never found (as we do here) that the second agreement was itself unambiguous.

12. Contrary to our dissenting colleague's suggestion, *see* Diss.Op. at 1125, we do not place "critical" or even "great" weight on the February letter. As the preceding discussion reflects, we rest our decision primarily on the unambiguous language of the Legally Binding Commitment, and not on extrinsic evidence. To the extent we discuss the February letter, and other events surrounding this project, we have done so merely to illuminate the activities that were taking place contemporaneously and to place them in context.

13. The dissent claims that we have made an improper inference in assuming that Arbor Hill received the February letter before signing the LBC. *See* Diss.Op. at 1125. The record, however, belies this conclusion. While nothing in the record reflects the *exact date* Arbor Hill received the letter, the affidavit of Arbor Hill's President, Mark Simmons, makes it clear that the letter was received before the signing of the LBC. The affidavit, which sets forth the relevant events in *chronological* order, indicates that Simmons received the February letter before signing the LBC. Simmons Affidavit at 7, *reprinted in* App. 739 ("*[p]rior to* signing the Legally Binding Commitment, the request for wage determination was informational in nature,") (emphasis supplied). Indeed, Arbor Hill, in its *own pleadings* before the district court said that:

> Mr. Simmons also complained that he and BBLR had determined the wage rates listed in the wage determination were substantially above actual area prevailing rates for residential construction.... *After these discussions*, the City and Arbor Hill Associates entered into a Legally Binding Commitment....

Plaintiff's Memorandum of Points and Authorities Opposing Defendants' Motion for Summary Judgment, *reprinted in* App. 677 (emphasis supplied).

Thus it does not appear ever to have been in dispute that Arbor Hill received the February letter before signing the LBC in April. Arbor Hill has not disputed before the district court or in its briefs on appeal that it received the February letter before signing the LBC, nor at oral argument did it dispute the basic chronology:

> The Court: Yes, well, the *in pari materia* includes the fact that before you got that contract, you got a clear indication as to what you were going to be required to pay. Then you signed a contract with that understanding.
>
> Counsel: Actually, the contract itself was signed earlier, in December of 1984. It was only this legally binding commitment, which is a paper put in place later.

Oral Argument Transcript at 32.

1985 the very Buffalo Office on which it was planning to rely sent the Albany Urban Renewal Agency a copy of the Department of Labor's Davis–Bacon wage levels and told the agency that Arbor Hill should be instructed to incorporate those levels into its own contracts with its contractors. Had Arbor Hill wished to formally maintain its opposition to paying Davis–Bacon wages, this was precisely the point at which it should have lodged a challenge to the applicability of Davis–Bacon, rather than entering into a Legally Binding Commitment promising to comply.[14]

Moreover, if there really had been a mutual understanding between HUD and Arbor Hill that the Buffalo Office would determine whether Davis–Bacon wages would apply, it is all the more difficult to understand why Arbor Hill, when it came time to "enter into [a] legally binding agreement[ ] evidencing the commitments which were relied upon by the Secretary," chose to use such unconditional language (*i.e.*, that it would "comply with the provisions of the Davis–Bacon Act"). Considering this sequence of events, we must conclude that Arbor Hill decided to forge ahead with the payment of Davis–Bacon wages rather than risk possible delays if it appealed the determination of Davis–Bacon's applicability. Everything that followed was rear guard action aimed at undoing the April 1 commitment.[15]

In sum, we find that Arbor Hill contractually agreed to pay Davis–Bacon wages.

B. *Wage Appeals Board Process*

Although we base our affirmance of the district court's judgment exclusively on Arbor Hill's contractual commitment, Arbor Hill's claims that the Wage Appeals Board process was tainted by bias and that the Board improperly failed to conduct a hearing merit brief responses.

Arbor Hill claims the Wage Appeals Board process was tainted by bias because one of its three members, Thomas Dunn, failed to recuse himself. Dunn's former firm, Sherman, Dunn, Cohen & Leiter, had represented the unions which had sought to intervene in this case to argue against the exclusion of the program under section 110. We have recently held:

> We review an agency member's decision not to recuse himself from a proceeding under a deferential, abuse of discretion standard. In an adjudicatory proceeding, recusal is required only where "a disinterested observer may conclude that [the decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." In other words, we will set aside a commission member's decision not to recuse himself from his duties only where he has "demonstrably made up [his] mind about important and specific factual questions and [is] impervious to contrary evidence."

*Metropolitan Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C.Cir.1995)

14. The government on a similar theme argues that Arbor Hill's petition to the Board was untimely, directing this court to 29 C.F.R. § 1.6(c)(2)(ii): "Modifications to project wage determinations and supersedeas wage determinations shall not be effective after contract award (or after the beginning of construction where there is no contract award)."

It is not entirely clear, however, that § 1.6(c)(2)(ii) would apply in this case. The regulation refers to "[m]odifications" to wage determinations, not challenges to their very applicability. *Cf. ICA Construction v. Reich*, 60 F.3d 1495 (11th Cir.1995) (contractor was challenging only modification of wage rates, not their applicability). Thus the situation may be covered only by the Wage Appeals Board's general regulation, 29 C.F.R. § 7.4(a): "Requests for review of wage determinations must be timely made. Timeliness is dependent upon the pertinent facts and circumstances involved...."

Moreover, even were the government correct that Arbor Hill's petition for review was untimely, the Board did not rely on that rationale in reaching its decision. Only Member Rothman, writing in concurrence and dissent, alluded to the fact that the petition was untimely. It is well-settled law that an agency's action may not generally be upheld on grounds other than those relied upon by the agency. *See National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943)).

15. One further example of this is the June, 1985 contract between Arbor Hill and its chief contractor BBLR which provided that BBLR would pay Davis–Bacon wages "if applicable." Those self-serving statements, however, could not undo the Legally Binding Commitment made by Arbor Hill to the City of Albany.

(quoting *United Steelworkers of Am. v. Marshall,* 647 F.2d 1189, 1209 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981)). Here, the record reflects that while Dunn's former firm represented the unions in this matter, Mr. Dunn was himself retired from the firm. In its briefs, Arbor Hill does not suggest that Dunn had a financial interest in this matter, that Dunn himself had worked on this matter while at the firm, or that anything in the record suggests that Dunn had "demonstrably made up [his] mind" about the issues here.[16] The fact that Dunn's former firm had an interest in the matter, without more, is not sufficient for this court to rule that the Wage Appeals Board's process was tainted by bias.

Arbor Hill also alleges that it was improperly denied an evidentiary hearing. Under Department of Labor regulations, a hearing is required where "the Administrator determines that there is a relevant issue of fact." 29 C.F.R. § 5.11(c)(2)(ii). Arbor Hill claims that material facts were in dispute, and directs us to Section III.C of its brief—the section setting forth the *entire* facts of the case. Nowhere in its briefs, however, does Arbor Hill identify a single specific disputed material fact. Nor does a comparison of Arbor Hill's position with that of the government reveal any material dispute as to the facts. Accordingly, we agree with the district court that "plaintiffs have failed to demonstrate that there were any material facts in dispute," and find that the Wage Appeals Board did not deprive Arbor Hill of its right to an evidentiary hearing.[17]

## III. Conclusion

We find that Arbor Hill contractually agreed to pay Davis–Bacon wages, and accordingly, affirm the judgment of the district court.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:

On April 1, 1985 Vulcan Arbor Hill Corporation (developer) signed a Legally Binding Commitment (LBC) agreeing "to comply with the provisions of the Davis–Bacon Act." JA 144. The Davis Bacon Act (Davis Bacon) "guarantee[s] to workers on federal construction projects a minimum wage based on locally prevailing wage rates." *Building & Constr. Trades' Dep't, AFL–CIO v. Donovan,* 712 F.2d 611, 613 (D.C.Cir.1983); *see* 40 U.S.C. § 276a. The majority concludes that "the language of [the] contract" *unambiguously* commits the developer to pay prevailing wages and therefore does "not consider extrinsic evidence of the parties' intent." *Maj.Op.* at 1117 (citing *American Postal Workers Union v. United States Postal Serv.,* 940 F.2d 704, 707–08 (D.C.Cir.1991)). Because I believe the contract issue cannot be decided on this record, I would remand for further proceedings to consider the contracting parties' intent. Unless the developer contracted to pay prevailing wages, I would hold the developer exempt from Davis Bacon's prevailing wage requirement under section 110 of the Housing and Community Development Act. *See* 42 U.S.C. § 5310(a).

## I. The Contract Issue

### A. Interpreting Provisions of Multi–Document Contract: Three Steps

We must interpret a contract provision so that it "is consistent with the contract as a whole," *BWX Elecs., Inc. v. Control Data Corp.,* 929 F.2d 707, 711 (D.C.Cir.1991) ("It is a fundamental tenet of contract interpretation that a contract provision should be interpreted, where possible, as consistent with the contract as a whole."); *Cruden v. Bank of N.Y.,* 957 F.2d 961, 976 (2d Cir.1992) ("[T]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency."); 24 Corbin, *Con-*

16. In addition, it appears that Arbor Hill may have withdrawn its objection to Dunn's hearing the case. The Board's majority opinion (authored by Dunn) says, "[a]fter Member Dunn explained that he no longer is associated with the law firm in any way, the Petitioners' objection was withdrawn."

17. We repeat that given our disposition of this case, it is not necessary to reach the merits of the dispute as to the proper interpretation of section 110.

*tracts* § 549 (1963) ("the terms of a contract are to be interpreted and their legal effects determined as a whole"); the goal is to determine what the parties intended a provision to mean. *See Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 169 (D.C.Cir.1981). If the contract consists of more than one document, the court conducts a three-step inquiry.

*Step One*

Parties to a contract can include more than one document in their agreement. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993) ("Under New York law a written contract may be formed from more than one writing."); *Friedman v. Manfuso*, 620 F.Supp. 109, 117 (D.D.C.1985) (" 'Where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other.' ") (quoting 17A C.J.S. *Contracts* § 298 (1963)); 24 Corbin, *Contracts* § 549 (1963) ("In many cases ... the terms of agreement may be expressed in two or more separate documents."). They may also decide to exclude specific documents. *Friedman*, 620 F.Supp. at 117 ("If documents are in fact independent, they may not be considered together even though they involve the same parties or the same subject matter."). To determine which documents the parties intended to include in their contract, one authority suggests asking "if the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken." *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir.1993) (quoting 6 Williston, *Contracts* § 863 (1979)). The court also considers whether the separate documents involve the same subject matter, the same parties, the same date of signing and whether the documents refer to each other. *See, e.g., Greene's Ready Mixed Concrete Co. v. Fullmore Pac. Assocs. Ltd. Partnership.*, 808 F.Supp. 307, 310 (S.D.N.Y. 1992).

*Step Two*

Once the relevant documents are assembled, the court considers the meaning of the contract provision in dispute. Interpreting the contract "as a whole" often allows us to easily reject alternative interpretations of the provision. *See, e.g., BWX Elecs., Inc.*, 929 F.2d at 711 (declining to interpret contract provision to forbid seller from negotiating with other potential buyers of building before certain date even though contract provided "[s]eller agrees to negotiate exclusively and in good faith with [b]uyer" before certain date because the "reading ... is flatly inconsistent with the rest of" contract). Language which appears in one provision to be "susceptible to only one meaning" can mean something different when other contract documents are considered. *See, e.g., United States v. ITT Continental Baking Co.*, 420 U.S. 223, 233, 95 S.Ct. 926, 932–937, 43 L.Ed.2d 148 (1975) (rejecting "literal" argument that "acquiring" as used in consent decree "unambiguously refers only to the initial transaction" because "other documents expressly incorporated in the decree" used "acquiring" to include more than initial transaction); *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49 (2d Cir.1993) (discussed below); *cf. Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 170 (D.C.Cir.1981) (conflicting provisions in single document create ambiguity).

*Step Three*

If the relevant documents make an otherwise "wholly unambiguous" clause "susceptible" to more than one "reasonable interpretation," the court allows the contracting parties to offer extrinsic evidence of their intent. *Davis*, 667 F.2d at 171; *Consarc Corp.*, 996 F.2d at 573; *Wards Co., Inc. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) ("[T]he non-moving party has a right to present extrinsic evidence" "where text of an agreement reasonably allows for varying interpretations."); *Wilson & Sons Heating & Plumbing v. NLRB*, 971 F.2d 758, 761 (D.C.Cir.1992) ("[I]n light of the linguistic ambiguity we press on to examine the extrinsic evidence"). If both parties offer " 'fairly reasonable' " but different interpretations of a contract, "a material issue exists concerning the parties' intent." *Wards Co. Inc.*, 761 F.2d at 120. We have summarized this step as follows: "However the test for determining the clarity of contract terms is

formulated, the core notion is clear: summary judgment on a contract is appropriate only when the relevant provisions are so straightforward that they can be read in but one way." *Davis*, 667 F.2d at 169–70.

*An Example*

In *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49 (2d Cir.1993), the court applied the three-step inquiry to a multiple document contract. The case involved an asset purchase agreement and a lease. The purchase agreement provided that the purchaser of the facility was responsible for "[a]ll other litigation occurring from and after the date of the [a]greement." *Id.* at 50. The lease stated that the lessee was not responsible for "pre-transfer on-site [environmental] contamination." *Id.* at 51. After the seller was sued for environmental response costs arising from pre-transfer damage alleged to have been caused by the facility's waste, the seller impleaded the purchaser, arguing that the suit constituted post-agreement "other litigation" within the indemnification provision of the asset purchase agreement. *Id.* The purchaser argued that the indemnification provision of the lease, limiting its responsibility for environmental damage to post-transfer contamination, controlled. *Id.* The district court granted summary judgment to the purchaser but the Second Circuit reversed.

Applying New York law, the Second Circuit interpreted the purchase agreement in light of the lease. First, the court noted that the two documents expressly referenced each other. The lease and the asset purchase agreement were signed at the same time and by the same parties; the court noted, however, that contemporaneous signing was not required. The assets were located on the leased property so the two documents involved the same subject matter. The court concluded that "the two transactions were intertwined": "Each depended on the other; neither stood alone." *Commander Oil*, 991 F.2d at 53. It concluded that the purchase agreement and the lease comprised a single contract and therefore should be interpreted together.

Next, the court found the asset purchase agreement's "all litigation" indemnification clause ambiguous. *Commander Oil*, 991 F.2d at 55. It acknowledged that the clause "could be read to extend indemnification coverage" but found that the lease contained "certain provisions which could be read to restrict coverage." *Id.* at 54. The court concluded that "the language of the indemnification provisions in the Asset Purchase Agreement when read in connection with the Lease is ambiguous as a matter of law." *Id.* at 55. Finally, to resolve the ambiguity, the court held that extrinsic evidence "bearing on the intent of the parties as to [the purchaser's] obligation to defend and indemnify" must be examined. *Id.* Accordingly, the court reversed the grant of summary judgment and remanded for further proceedings.

B. Relevant Facts

Because the majority construes only the Legally Binding Commitment, its marshaling of the facts leaves some gaps. The gaps relate both to the documents that, as discussed below, comprise the contract and to the extrinsic evidence.

*Grant Process*

Under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq.*, Congress has authorized "urban development action grants [UDAGs] to cities and urban counties which are experiencing severe economic distress to help stimulate economic development activity needed to aid in economic recovery." 42 U.S.C. § 5318(a). A city or county of any size may apply for a UDAG provided it has "demonstrated results in providing housing ... and employment for low- and moderate-income persons." *Id.* § 5318(b). Each applicant must also show "economic distress" as determined by "factors such as the age of housing; the extent of poverty; the extent of population lag; growth of per capita income; and, the extent of unemployment, job lag, or surplus labor." *Id.* The Department of Housing and Urban Development (HUD), the federal agency responsible for administering the UDAG program, finances a grant application based on "the comparative degree of economic distress among applicants," the "comparative degree of economic deterioration" and "the extent to which the grant will stimulate economic re-

covery by leveraging private investment." *Id.* § 5318(d); *see* 24 C.F.R. § 570.459(b).

Before receiving UDAG funds, an application must win both "preliminary" and "final" approval from HUD. Considering the statutory factors, HUD decides whether to grant an application "preliminary approval." 24 C.F.R. § 570.460(c)(1). Preliminary approval, however, is only the "first step" to receipt of UDAG funds.[1] Receipt first requires the execution of at least two separate documents: (1) the UDAG agreement (Grant Agreement) between HUD and the grant recipient and (2) the Legally Binding Commitment(s) (LBC) between the grant recipient and the private sector (including the developer). § 570.461(b) ("[D]rawdown of grant funds is conditioned upon the written acceptance by HUD of the legally binding commitment as specified in the grant agreement."). Once HUD and the recipient execute the Grant Agreement, which spells out the responsibilities of all of the participating parties, including the responsibilities of the private sector developer contained in the LBC, preliminary approval is "finalized." Preliminary approval ripens into final approval when HUD approves the LBC. *Id.* ("Preliminary approval does not become final until legally binding commitments between the recipient and the private and public participating parties have been submitted and approved by HUD.") *See City of Kansas City, Mo. v. HUD,* 923 F.2d 188, 189 (D.C.Cir.1991) ("Final [UDAG] grant approval and actual disbursement of grant funds are conditioned on the submission and acceptance of these legally binding commitments."). Grant funds are released in stages as the recipient adheres to the Grant Agreement's schedule. § 570.461(d) ("[G]rant funding shall be conditioned upon the performance of the recipient in meeting the schedule set forth in its grant agreement.").

*Three Documents*

The City of Albany (City or Albany) applied for a $3.5 million UDAG to help rehabilitate residential properties in Albany's Arbor Hill neighborhood. Pursuant to the Arbor Hill proposal, the City agreed to transfer the UDAG funds to the Albany Local Development Corporation (ALDC), a non-profit agency established for the grant, which agreed to lend the money to the developer. JA 123. The Albany Urban Renewal Agency (AURA) administered the grant for the City. Each stage of the UDAG application-to-receipt process has produced a relevant document.

1. Application: September 20, 1984 Letter

In a letter dated September 20, 1984 from Mark Simmons, the developer's president, to William Seedyke, the Washington HUD official who reviewed Albany's grant application, the developer "accept[ed] the terms of the UDAG Loan." September Letter, JA 508. After summarizing the terms of the Arbor Hill proposal, the letter states in the final sentence: "Developer acknowledges that with the guidance of the Buffalo area office of the U.S. Dept. of Housing and Urban Development [HUD Buffalo Office] that *if Davis–Bacon is required by the area office, such wages will be paid by the developer.*" JA 510 (emphasis added). The letter makes no other mention of wage rates.

2. Preliminary Approval: Grant Agreement

The City's UDAG application was successful. On October 4, 1984 HUD gave preliminary approval to the application. JA 98. HUD and the City executed the Grant Agreement on December 27, 1984. JA 98.

1. HUD's implementing regulations provide in part:

> Preliminary approval constitutes the first step in a process which may result in a signed grant agreement between the recipient and HUD and legally binding commitments between the recipient and the private sector. The terms of the preliminary approval are not finalized until the recipient and HUD have executed a grant agreement setting forth the terms and conditions of the approved project and the responsibilities of all participating parties. Preliminary approval does not become final until legally binding commitments between the recipient and the private and public participating parties have been submitted and approved by HUD. Release of grant funds is contingent upon the recipient's meeting each and every condition set forth in the grant agreement.

24 C.F.R. § 570.460(c)(5).

The Grant Agreement expressly incorporates the September Letter as a rider thereto. The rider lists the documents contained in the City's application, including the September Letter. JA 120. In Article X of the Agreement HUD expressly relies on the City's and, more importantly, the developer's "representations" and "commitments." [2] The developer's only "representations" and "commitments" of record are those set forth in the September Letter. The Grant Agreement itself makes no mention of the Davis Bacon Act or wage rates. Accordingly, as of December 27, 1984 the participating parties' only representation regarding the applicability of the Davis Bacon prevailing wage requirement is the September Letter which commits the developer to pay prevailing wages if required by the HUD Buffalo Office.

3. Final Approval: Legally Binding Commitment

In accordance with HUD regulations and the Grant Agreement, JA 106, on April 1, 1985 the City entered into a "legally binding commitment" with the ALDC and the developer. JA 141–44. Most of the LBC addresses the mortgage agreements governing the project. *Id.* It also contains two references relevant to our inquiry. First, it contains the provision that the majority finds determinative of the appeal: "Arbor Hill Associates agrees that it will require its Construction Manager and those parties who are its prime and sub-contractors *to comply with the provisions of the Davis–Bacon Act.*" JA 144 (emphasis added). Second, the LBC expressly incorporates the Grant Agreement, and, with it, the September Letter.[3]

*Extrinsic Evidence*

The record contains other evidence that the developer did not, by signing the LBC, intend to commit unconditionally to pay prevailing wages. On June 21, 1985 the developer signed a construction contract with its contractor, Barry, Bette & Led Duke Residential, Inc., which required the contractor to pay Davis Bacon prevailing wages "if applicable." JA 739. After signing the LBC, Simmons continued to seek the statutory exemption in a series of letters "communicating increasing urgency." *Maj. Op.* at 1113; *see* August 22, 1985 letter, JA 710 ("We ... are in a rather peculiar position since we do not yet know if Davis–Bacon wage standards apply to our project."). On August 30, 1985 the HUD Buffalo Office *granted* the developer the section 110 exemption, JA 174, and construction proceeded with wages being paid below those "prevailing," apparently without objection from the City or from ALDC.[4]

The majority places great, even critical, weight on a February 7, 1985 letter (Febru-

2. Article X states in pertinent part:
In selecting the Recipient for the award of this grant, the Secretary has relied, in material part, upon the representations of the Recipient and Participating Parties that the Recipient and the Participating Parties (i) will carry out certain activities connected with the Project; (ii) will complete those activities; (iii) have, or will have, the financial capability to assure the carrying out of these activities to their completion and (iv) will invest, or cause to be invested, a specific value amount in the Project. The *Secretary has also relied upon* the Recipient and *Participating Parties' representations that such participating Parties will,* prior to any use of grant funds for the Project, *enter into legally binding agreements evidencing the commitments which were so relied upon by the Secretary.*
JA 112 (emphasis added).

3. The Grant Agreement provides in part: "the parties hereby agree to be bound by the terms of the UDAG Agreement ... and the parties incorporate said UDAG Agreement into this commitment by reference." JA 141.

4. Affidavits opposing DOL's summary judgment motion also indicate that the parties to the LBC did not intend that the developer be unconditionally committed to pay prevailing wages. Simmons's affidavit declares: "When I signed the Legally Binding Commitment (LBC) between Vulcan and the City of Albany, it was understood and agreed to by Vulcan and the City that I would apply for the Exemption from Davis Bacon." JA 740. An affidavit from an ALDC employee states: "At the time of the execution of the LBC by the parties, it was understood by the ALDC that the Developer was intending to attempt to secure an exemption from Davis–Bacon provisions." JA 790. At the summary judgment stage, the non-movant's affidavits, even if self-serving, must be considered. *See Davis,* 667 F.2d at 169 ("When reviewing a grant of summary judgment, we are, of course, obliged to view the record in the light most favorable to the party opposing the motion and to resolve all questions of inference in favor of that party.").

ary Letter) from the Director of Labor Relations of the HUD Buffalo Office to AURA. Three months earlier, in November 1984, soon after HUD had given preliminary approval to Albany's UDAG application, the HUD Buffalo Office requested, apparently at the developer's urging, a "wage determination" from the Department of Labor (DOL). JA 464. One day after the Grant Agreement was signed, the DOL issued a wage decision applying prevailing wages to the Arbor Hill project. JA 464; *see also* JA 442. On February 7, 1985 the HUD Buffalo Office sent AURA a copy of the DOL wage decision with instructions to incorporate it into contract specifications for prospective bidders. JA 463.

The majority concludes from the February Letter that the developer then knew that the Buffalo Office intended to enforce Davis Bacon wages. *Maj. Op.* at 1113 ("This letter put Arbor Hill [the developer] on notice that the Department of Labor believed Davis Bacon wages applied, and that HUD's Buffalo Office intended to enforce the application of Davis Bacon."). Its conclusion rests on an inference made *against* the developer although, as earlier noted, at this stage the developer is entitled to have factual inferences resolved in its favor. *See* Fed.R.Civ.P. 56(c). The inference is that the parties to the LBC interpreted the February Letter to mean that "HUD's Buffalo Office intended to *enforce* the application of Davis–Bacon." *Maj. Op.* at 1113 (emphasis added).[5] The February Letter indicates that the HUD Buffalo Office considered the wage determination to be DOL's decision to apply Davis Bacon wages. *See* JA 463. On the other hand, HUD's subsequent *granting* of the statutory exemption (in September) casts doubt on the majority's interpretation of the February Letter as manifesting HUD's intent to abandon any effort to apply the section 110 exemption. *See* JA 174. It may well be, as the developer contends, App. Br. at 12 n. 13, that HUD and ALDC and perhaps even AURA, like the developer, considered the February Letter "informational." Again, at the summary judgment stage, the facts and inferences are to be construed in the developer's favor.[6]

C. Interpreting Legally Binding Commitment: Applying Three Steps

Under New York contract law, it is beyond dispute that the Grant Agreement and the Legally Binding Commitment form a single contract.[7] Although signed several months apart and, in part, by different parties, the latter expressly incorporates the former and they both cover the same subject matter. More important, the "two are intertwined ... one would not exist without the other." *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir.1993). The Grant Agreement contains the "representation" that the City and the developer will

5. It is far from clear when or how the developer learned of the February Letter. The majority implies that the developer received a copy of the wage determination in February. *See Maj. Op.* at 1118 (*"[i]n February, Arbor Hill,* through the Albany Renewal Agency, *was sent a letter"*) (emphasis added). But the February Letter is addressed to AURA and does not show copies to the developer or to ALDC. JA 463. ("Please furnish your architect/engineer a copy of this letter and the wage decision."). From Simmons's affidavit we know that he was probably aware of the February Letter before April 1st, the date the LBC was signed. JA 739. ("Prior to signing the Legally Binding Commitment, the request for wage determination was informational in nature."); *cf.* JA 76 ("Both the developer and the prime contractor were provided a copy of the wage determination at the preconstruction conference on April 3, 1985."). At that point, however, Simmons believed it to be "informational" only. JA 739.

6. A comparison of the extrinsic evidence here with the evidence in *Woodside Village v. Department of Labor,* 611 F.2d 312 (9th Cir.1980), reveals why *Woodside* provides the majority opinion little support. In *Woodside,* the developer signed both a construction contract and a mortgage contract promising to pay prevailing wages. *Id.* at 314. In addition, the developer submitted payroll reports to HUD maintaining, inaccurately, that he was paying prevailing wages. The court agreed with the DOL decision, "based on comprehensive findings," that the developer "voluntarily and knowingly agreed to perform the contract in conformity with" the Act. *Id.* at 315–16.

7. The Grant Agreement, incorporated in the LBC, provides that: "provisions of this Grant Agreement shall be governed by and construed in accordance with the laws of the Recipient's State." JA 117.

"enter into legally binding commitments" and the LBC constitutes the fulfillment of that representation. *See* 6 Williston, *Contracts* § 863 ("[T]he terms of agreement may be expressed in two or more separate documents, some of them containing promises and statements as to their agreed consideration, and others, such as deeds, mortgages and trust indentures, being performances agreed on rather than a statement of terms to be performed ... these documents should be interpreted together"). Accordingly, the otherwise "unambiguous" Davis Bacon language contained in the LBC must be read together with the Grant Agreement because the two documents *together* formed the contract.[8]

The contract's two Davis Bacon provisions appear to conflict. While, read alone, the LBC language "comply with ... Davis–Bacon" unconditionally requires the developer to pay prevailing wages, the LBC also incorporates the September Letter, *via* the Grant Agreement, stating "if Davis Bacon is required by the area office, such wages will be paid by the developer." This provision makes the developer's agreement to pay prevailing wages depend on the decision of the HUD Buffalo Office.

Reading the contract "as a whole," I cannot but conclude that the LBC's "comply with the provisions of the Davis–Bacon Act" language is ambiguous. Like the seller in *Commander Oil,* the majority seizes on one broad phrase in one document. (*Compare* "[a]ll other litigation" *with* "comply with ... Davis–Bacon"). Like the *Commander Oil* court, however, I believe that language in another document that is part of the contract makes the otherwise unambiguous phrase ambiguous and thus requires resort to extrinsic evidence. The contract's "if Davis–Bacon is required" language read together with its "comply with ... Davis–Bacon" language may commit the developer to prevailing wages only if the HUD area office so required. On this reading, "comply with ... Davis–Bacon" means "comply with the Buffalo Office's Davis–Bacon decision." It therefore takes far less than "contorted semantic[s]," *see Wards Co., Inc.,* 761 F.2d at 120, to claim that it is not "wholly unambiguous" whether the developer agreed unconditionally to pay prevailing wages.[9]

Because "the relevant provisions" are not "so straightforward that they can be read in but one way," summary judgment based solely on the contract provisions is inappropriate. *Davis,* 667 F.2d at 170. Nevertheless, the record contains too many gaps to grant summary judgment in favor of the developer. Accordingly, I would remand the case to the district court for further proceedings on the contract issue.

## II. The Statutory Exemption

Remand is necessary because, in my opinion, without a contractual commitment, the developer is exempt from the Davis Bacon prevailing wage requirement. At the time of the Arbor Hill proposal, Section 110 of the Housing and Community Development Act (section 110) exempted a residential rehabilitation project from the prevailing wage requirement if the "property" to be rehabilitated "is designed for residential use" by fewer than eight families.[10] Because each property

8. The application (including the September Letter) was *expressly* made part of the grant contract. *See* Grant Agreement Article I ("This agreement shall consist of this Grant Agreement *and the Application.*") JA 101 (emphasis added); Article II ("In consideration of the various obligations undertaken by the Recipient pursuant to this Grant Agreement, and in consideration of the obligations to be undertaken by Participating Parties, as represented by the Recipient *in the Application,* the Secretary agrees ... to provide the Recipient with grant funds.") JA 102 (emphasis added).

9. The majority agrees that the LBC incorporates the Grant Agreement containing the September Letter's "contradictory statement." *Maj.Op.* at 1117 n. 9. Nevertheless, the majority concludes that "the absolutely clear language in the LBC would have to be *bent totally out of shape* to bring it into accord with the language of the September Letter." *Id.* (emphasis added). As already noted, one legitimate reading of the LBC's "comply with ... Davis–Bacon provision" is that it commits Arbor Hill to "comply with the Buffalo Office's Davis–Bacon decision." The majority provides not a single reason for rejecting this reading of the LBC.

10. Section 110(a) then provided:

> All laborers and mechanics employed by contractors or subcontractors in the performance of construction work financed in whole or in

in the Arbor Hill rehabilitation project was designed for residential use by fewer than eight families, the developer is exempt from paying prevailing wages.

If Congress answers "the precise question at issue, that intention is the law and must be given effect." *Chevron,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9. To apply the *Chevron* "step one" test we first describe "the precise question at issue" and then, "having studied the statutory text," *id.,* decide whether Congress answered the question. *See Alabama Power Co. v. U.S.E.P.A.,* 40 F.3d 450, 454 (D.C.Cir.1994) ("Our primary inquiry is whether Congress has directly spoken to the question.") If Congress has answered the very question at issue, "that is the end of the matter." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781.

The pre–1988 version of section 110 exempts from the prevailing wage requirement a project involving "the rehabilitation of residential property" unless the property is "designed for residential use for eight or more families." 42 U.S.C. § 5310(a). The issue is whether a developer who, acting under a UDAG, rehabilitates multiple residential properties, none of which is designed for use by more than seven families, must pay prevailing wages. The Wage Appeals Board, rejecting HUD's contrary interpretation, held that section 110 did not exempt the developer from paying prevailing wages.[11]

DOL's statutory interpretation relied on two conclusions. First, without explanation, DOL's Wage Appeals Board announced that the language of section 110 is "ambiguous." [12] JA 650. After asserting ambiguity, the Board voiced its concern that, if the developer were exempt from paying union wages, "one rehabilitation contract for $1,000,000 covering many residential buildings on a one owner tract of land ... connected by walks, enclosed by a fence and [ ] served by private roads and common recreational facilities such as clubhouse, swimming pool, tennis courts and play ground [would also be exempt from] Davis–Bacon wage rates." *Id.* DOL then interpreted section 110 so that both the developer and the hypothetical complex would have to pay union wages.[13]

I am convinced that both DOL conclusions are wrong. First, and most significantly, section 110 is not ambiguous.[14] I find it impossible to read section 110 other than to

part with assistance received under this chapter shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis–Bacon Act, as amended (40 U.S.C. 276a–5); *Provided that this section shall apply to the rehabilitation of residential property only if such property is designed for residential use for eight or more families.* The Secretary of Labor shall have, with respect to such labor standards, the authority and functions set forth in Reorganization Plan Number 14 of 1950 (15 Fed.Reg. 3176; 64 Stat. 1267) and section 276c of Title 40.

Housing and Community Development Act of 1974, Pub.L. No. 93–383, § 110, 88 Stat. 633, 649 (1974) (emphasis added). In 1988, Congress amended section 110, replacing "is designed for residential use for eight or more families" with "contains not less than 8 units." Pub.L. No. 100–242, § 523 (1988); *see* 42 U.S.C. § 5310.

**11.** In the DOL administrative proceedings, JA 551, HUD argued that DOL's interpretation of the statute was wrong. Nevertheless, HUD took the position that it must enforce the DOL decision, apparently relying on section 110's reference to Reorganization Plan Number 14 of 1950. To that end, HUD directed the City to "cause the withholding of $700,000 from Vulcan's 3.5 million dollar UDAG for possible back wages." JA 643. As the Supreme Court has noted, however, the "binding effect of the [Labor] Department's coverage determination on the contracting agency is disputed." *Universities Research Ass'n, v. Coutu,* 450 U.S. 754, 760 n. 9, 101 S.Ct. 1451, 1456 n. 9, 67 L.Ed.2d 662 (1981).

**12.** The district court, also without explanation, found ambiguity "apparent from the fact that a central issue in this case concerns the reasonableness of the Board's interpretation of the term." JA 972.

**13.** "Accordingly, the Board concludes that the eight unit threshold in Sec. 110 for application of Davis Bacon prevailing wage requirements to the rehabilitation of residential property refers to the aggregate number of units in all the buildings being rehabilitated whenever they are commonly owned, will be operated as a single project, and are situated either side-by-side or on contiguous lots." JA 653.

**14.** An agency assertion of ambiguity does nothing to establish that the statute is in fact ambiguous; we "must reject administrative constructions which are contrary to clear congressional intent." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.

express the clear Congressional intent to base the exemption on the "design[ed] use" of the "property." The Arbor Hill "rehabilitation of residential property" rehabilitates eighty-two separate properties none of which is "designed for residential use for eight or more families." [15] In light of the "unmistakable conclusion that Congress had an intention on the precise question at issue," *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781, I believe the developer is exempt from the prevailing wage requirement: that is "the end of our inquiry." *See Liberty Maritime Corp. v. United States,* 928 F.2d 413, 420 (D.C.Cir.1991) (Buckley, J., concurring).

Moreover, even though the proviso's clear text exempts the developer from paying prevailing wages, the statute would not similarly exempt DOL's hypothetical complex. If the residential property to be rehabilitated is *designed* as a complex, the "property" is then designed for residential use for eight or more families and the rehabilitation project would not be entitled to the section 110 exemption.

### Conclusion

When contracting parties become litigating parties, the role of the court is to give effect to the parties' intent as evidenced, if possible, by the text they agreed to. It plays a similar role when interpreting statutory text. *See Alabama Power,* 40 F.3d at 454, quoting *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (" 'If the intent of Congress is clear, that is the end of the matter.' "). Additionally, the court must consider the entire document, be it a contract or a statute. *See Alabama Power,* 40 F.3d at 455 ("Statutory text is to be interpreted to give consistent and harmonious effect to each of its provisions.") This case illustrates the difference between contractual ambiguity and statutory clarity.

Because interpreting the "whole" contract renders the Davis Bacon language in the Legally Binding Commitment ambiguous, the district court must consider extrinsic evidence of the parties' intent. Accordingly, I would remand to the district court to resolve whether the parties intended the Legally Binding Commitment to preclude the developer from seeking an exemption from the Davis Bacon prevailing wage requirement under section 110. On the other hand, section 110 is not "ambiguous" because the text plainly states "property," not "an aggregation of properties," and no "property" was designed to be used as a residence for eight or more families. If the parties did not otherwise agree by contract to preclude the developer from seeking a section 110 exemption, I would hold the developer exempt from the Davis Bacon Act.

Accordingly, I dissent.

15. That the eighty-two individual properties were concurrently rehabilitated, were in the same neighborhood and, to secure financing, were owned after renovation for a limited period by the developer does not alter the fact that each property remained, and presumably remains to this day, a separate "property."